UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, § § Plaintiff, § v. § § ROBIN GLEN CHARLET, § STEVEN WILLIAM SPARKS, § GREGORY JOHN TUTHILL, and § KIRK DEAN PORTER, § § Defendants. § | CASE NO. |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") files this Complaint against Defendants Robin Glen Charlet, Steven William Sparks, Gregory John Tuthill, and Kirk Dean Porter (collectively "Defendants"), respectfully alleging the following:

## I.
## SUMMARY

1.      From at least September 2010 through January 2012, Defendants were the principal sales agents for XO Marketing Solutions, Inc. ("XO Marketing"), a company engaged by Couch Oil & Gas, Inc. ("COG") and Charles Couch ("Couch"), a Texas oil and gas operator and COG's owner, president, and chief executive officer, to sell interests in COG's Permian-Black Shale-Fifty Nine Well Program (the "59 Well Program") and its Radial Nine Well Program (the "R9 Program") (collectively the "Programs"). Through these unregistered securities offerings, Defendants raised, on behalf of COG and Couch, almost $10 million from more than 200 investors in at least 21 states. Defendants sold securities to non-accredited

investors in these Programs without providing them with financial statements or other financial information.

2.      On May 12, 2014, the Commission charged Couch and COG with selling unregistered securities and with securities fraud in connection with their offer and sale of securities in the Programs. *Securities and Exchange Commission v. Charles Couch, et al.*, Civ. Action No. 3:14-CV-1747-D (N.D. Tex.) ("Couch Litigation").

3.      On May 9, 2016, a Final Judgment was entered in the Couch Litigation against Couch and COG, permanently enjoining them from violating securities laws and from selling securities to others. The Final Judgment also required them to pay disgorgement, prejudgment interest, and civil penalties totaling more than $7.3 million.

4.      While much of the misleading information provided to COG investors about the Programs was prepared by Couch, Defendants were responsible for handling a variety of key steps in the purchase and sale transactions in the offerings, including promoting the Programs online, locating investors, distributing offering materials, and making recommendations concerning the securities offered for sale. COG and Couch compensated XO Marketing based on Defendants' total sales. Out of those proceeds, Porter, who owned XO Marketing, compensated Charlet, Tuthill, and Sparks based on their individual percentage of the sales, and appears to have paid Charlet additional compensation based on sales made by Tuthill and Sparks. Porter received his commissions by keeping the balance of XO Marketing's bank account for himself after covering XO Marketing's expenses.

5.      Despite their involvement in these selling activities and their receipt of transaction-based compensation, Defendants were not registered with the Commission or FINRA in any capacity, or licensed as brokers, at any point during the relevant period.

6. In light of Defendants' conduct, alleged in further detail below, the Commission requests a judgment against Defendants (1) permanently enjoining them from selling unregistered securities in the future in violation of registration provisions of the Securities Act of 1933 (the "Securities Act") and the Securities and Exchange Act of 1934 (the "Exchange Act"), and (2) ordering them to pay disgorgement with prejudgment interest and civil penalties.

## II.
## JURISDICTION AND VENUE

7. Defendants offered and participated in the sale of units of fractional undivided working interests in the Programs' wells, which constituted "securities" and "investment contracts" under Section 2(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

8. The Commission brings this action under Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)]. The Commission seeks the imposition of civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §§ 78u(d)].

9. This Court has jurisdiction over this action under Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Sections 21 and 27 of the Exchange Act [15 U.S.C. §§ 78u and 78aa] because Defendants directly or indirectly made use of any means or instrumentality of interstate commerce and/or of the mails in connection with the transactions described herein. Venue is proper under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because certain of Defendants' acts, practices, transactions, and courses of business alleged herein occurred within this judicial district, as this was the district in which COG maintained its headquarters and business offices, which address Defendants used in their correspondence with potential and actual investors, and

is where Defendants directed their communications with Couch and COG. In addition, Porter, Charlet, and Tuthill traveled to this District for at least one meeting with Couch and COG personnel and to see the Programs' oil wells, which are located in this District.

## III.
## PARTIES

10. Robin G. Charlet, age 36, was last known to reside in Anaheim, California, but upon information and belief may now be living in Indiana. Charlet was employed as an independent contractor by XO Marketing, a company owned solely by Defendant Porter and hired by COG and Couch to sell the working interests in the Programs. At all times relevant to this action, Charlet was neither a registered representative nor associated with any broker, dealer, or investment adviser and did not hold any securities licenses. On December 16, 2014, a court-appointed receiver for Gates Oil & Gas Ltd., an Oklahoma company, sued Charlet and two entities associated with him, Pixelbridge Media, LLC and Advanced Business Group, in Oklahoma for their alleged involvement in the fraudulent offer and sale of unregistered securities and wrongful receipt of funds obtained from investors. That matter is ongoing. *See Receiver, et al. v. Pixelbridge Media, LLC, et al.*, CJ-2014-6852 (Oklahoma County D. Ct., 2014). On December 24, 2015, the Washington Securities Division issued a cease-and-desist order against Charlet to halt the offer and sale of unregistered securities, the transaction of business as an unregistered agent, and the omission of material facts in connection with the offer or sale of securities in that state. *See In the Matter of Couch Oil & Gas, Inc., Charles O. Couch, Robin Charlet and Kirk Porter*, October 8, 2014.

11.    Steven W. Sparks, age 37, resides in Irvine, California. XO Marketing employed Sparks as an independent contractor to sell working interests in the Programs. At all times relevant to this action, Sparks was neither a registered representative nor associated with any broker, dealer, or investment adviser and did not hold any securities licenses. On December 16, 2014, the receiver for Gates Oil & Gas Ltd., described above, sued Sparks and the two entities Pixelbridge Media, LLC and Advanced Business Group, which Sparks, in addition to Charlet, is associated with, for their alleged involvement in the fraudulent offer and sale of unregistered securities and wrongful receipt of funds obtained from investors. That matter is ongoing. *See Receiver, et al. v. Pixelbridge Media, LLC, et al.*, CJ-2014-6852 (Oklahoma County D. Ct., 2014).

12.    Gregory J. Tuthill, age 42, resides in Anaheim, California. XO Marketing employed Tuthill as an independent contractor to sell working interests in the Programs. At all times relevant to this action, Tuthill was neither a registered representative nor associated with any broker, dealer, or investment adviser and did not hold any securities licenses. On September 29, 2008, the Wisconsin Division of Securities issued an Order of Prohibition against Tuthill for the offer and sale of unregistered securities by an unlicensed person in that state. *See In the Matter of Greg Tuthill*, September 29, 2008.

13.    Kirk D. Porter, age 49, resides in Santa Monica, California. Porter is the founder, owner, principal, and control person of XO Marketing. At all times relevant to this action, Porter was not a registered representative and was not associated with any broker, dealer, or investment adviser and did not hold any securities licenses. XO Marketing was likewise not registered or licensed. On April 20, 2012, the Office of the Secretary of State for the State of Missouri issued a cease-and-desist order against Porter to halt his offer and sale of unregistered securities, the

transaction of business as an unregistered agent, and the omission of material facts in connection with the offer or sale of securities in that state. *See In the Matter of Pop N Go, Inc., Melvin Wyman, and Kirk Porter*, April 20, 2012. On October 8, 2014, the Washington Securities Division issued a cease-and-desist order against Porter to halt the offer and sale of unregistered securities, the transaction of business as an unregistered agent, and the omission of material facts in connection with the offer or sale of a securities in that state. *See In the Matter of Couch Oil & Gas, Inc., Charles O. Couch, Robin Charlet and Kirk Porter*, October 8, 2014.

## IV.
## FACTS

**A.  Background: Couch and COG Fraudulently Offered and Sold Fractional Interests in Two Drilling Programs.**

14. From at least September 2010 through January 2012, Couch, directly and through his company COG, carried on a fraudulent scheme and made materially false and misleading statements and omissions to potential and actual investors in order to make unregistered offers and sales of securities in the Programs.

15. Both Programs raised money for the stated purpose of drilling oil wells in West Texas. COG purported to offer and sell fractional undivided working interests in the Programs' wells. The interests COG offered and sold were securities and investment contracts. Despite that, neither Couch nor COG filed a registration statement with the Commission for either Program. Nor did they file a Form D with the Commission identifying whether the Programs were exempt from registration.

16. On May 12, 2014, the Commission charged Couch and COG with securities fraud and registration violations under Sections 5(a), 5(c), and 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. *Securities and Exchange Commission v. Charles Couch, et al.*, Civ. Action No. 3:14-CV-1747-D (N.D. Tex.) In its complaint, the

Commission alleged that Couch and COG made materially false and misleading statements in offering documents and other communications to investors, including unsubstantiated and highly inflated projections of potential production from wells in the Programs. Couch and COG also failed to tell investors that 30% of their investments would be diverted to XO Marketing and the Defendants as commission payments.

17. On May 9, 2016, the court entered a final judgment against Couch and COG. The final judgment enjoined Couch and COG from issuing, purchasing, offering, or selling any securities in the future, except for their own accounts. The judgment also enjoined them from violating Sections 5(a), 5(c), and 17(a) of the Securities Act. The judgment further ordered Couch and COG to pay disgorgement of $6,260,025, prejudgment interest on that amount of $811,788.87, and ordered each of them to pay a civil penalty of $300,000. The disgorgement amount that Couch and COG were ordered to pay did not include the amounts that COG paid to XO Marketing.

**B.    Defendants Marketed the COG Securities.**

18. Couch hired Defendants, through XO Marketing, to promote oil and gas offerings, including the Programs. The Programs and opportunities to invest in them were described on COG's website and in press releases and other electronic communications. Each Defendant disseminated COG press releases and other information on the internet and through emails, touting the alleged success of COG's drilling operations. Porter and Charlet also enhanced COG's existing website and created other websites, described as "portals," to provide information about COG's projects. Sparks worked to optimize and enhance the visibility of COG's websites, including reviewing search engine algorithms, calling search engine providers and working to reduce XO Marketing's internet marketing cost per lead.

19.     Through the COG websites, Defendants also gathered information from interested investors.  When prospective investors submitted information through the portal indicating an interest in a COG drilling program, Defendants reached out to them by telephone to gauge their interest in the investment.  During these sales calls, each Defendant provided information about the current COG offering to the prospective investors, including an overview of COG's operations, drilling techniques and drilling plans, as well as information about the performance of prior programs, expected returns and economic projections for the current program, and expected tax advantages.  Each Defendant also made recommendations concerning the securities offered by COG and persuaded investors to invest in the Programs.  Defendants lacked any background in the oil and gas industry and Couch provided them a substantial amount (if not all) of the information they disseminated.

20.     Each Defendant provided prospective investors a glossy brochure, referred to as the "Business Synopsis" or "Executive Summary," describing the Programs.  These color brochures, along with a subscription agreement, were the primary (or only) disclosure documents Defendants provided investors while soliciting their investment.  Couch prepared the contents of these documents, but Porter and Charlet "beautified" the brochures (as Porter described it)—making them more readable and attractive to prospective investors by formatting the text, arranging photos, and adding borders, logos, and other elements. Defendants sent the final brochure to Couch for his approval before distributing it to investors.  None of these documents—the brochures or the subscription agreements—included any financial data for COG or for the Programs.

20.     Many of the Programs' investors were not "accredited investors," as defined under Rule 501(a) of Regulation D under the Securities Act.  In addition, many investors were unsophisticated in business and investments, particularly in the oil and gas industry.

21.     Many investors had no contact with Couch or COG before investing, but instead dealt exclusively with the Defendants.  Defendants frequently were the ones who "closed" the sale of the investment with the investors.  Defendants led investors to believe that they were employees of COG by using COG's logo and address in Irving, Texas in their communications with investors, as well as email domains such as "couchoil.com" and "couchoilgas.com."  Each Defendant remained in contact post-investment with the particular investors whom they had solicited and secured in order to provide updates on the Programs and inform them of new COG investment opportunities.

C.     **Defendants Received Transaction-Based Compensation.**

22.     Once investors decided to invest in one of COG's Programs, Defendants directed them to submit checks or initiate wire transfers directly to COG.  Defendants raised nearly $10 million in the two Programs, from approximately 200 investors in at least 21 states nationwide – including Pennsylvania, where Couch and COG had been previously ordered to cease and desist from securities solicitations. XO Marketing's records are not complete or have been destroyed, but an analysis of the company's bank records shows that Charlet sold or participated in the sale of approximately 59 investors the 59 Well Program and 57 investors the R9 Program; that Sparks sold approximately 22 investors the 59 Well Program and 27 investors the R9 Program; and Tuthill sold approximately 16 investors the 59 Well Program and 21 investors the R9 Program.  Porter did not make payments directly to himself from the XO Marketing bank account, so it is not possible to determine the number of investors he brought into the Programs

through an analysis of the bank records.  But, as principal and owner of XO Marketing, Porter was directly responsible for the offer and sale of all securities made by XO Marketing and Charlet, Sparks and Tuthill.

23. After receiving an investor's funds, COG sent 30% of those proceeds directly to XO Marketing as commission payments. From January 1, 2011 through February 28, 2012, XO Marketing received a total of $2,024,634.85 from COG for the sale of securities during that time period.  Porter then caused XO Marketing to pay 10-15% of the proceeds XO Marketing received from COG to each of Tuthill, Charlet, and Sparks as commissions, based upon the investor proceeds each brought in. Charlet also may have received an additional commission payment on the commissions paid to Tuthill and Sparks.  Porter, who owned XO Marketing, did not transfer funds from the XO Marketing bank account to his personal bank account.  Instead, he retained the balance of the XO Marketing account as commissions after covering XO Marketing's expenses and deducting sales commissions paid to Charlet, Sparks, and Tuthill. From January 1, 2011 through February 28, 2012, Defendants received the following amounts as transaction-based compensation:

| Broker | Commissions Paid |
| --- | --- |
| Porter | $840,325.08 |
| Charlet | $835,912.67 |
| Sparks | $174,881.50 |
| Tuthill | $173,515.60 |

24. Couch testified that after he learned that the Commission was investigating him, he told Defendants to "wind up" their sales. However, after Couch allegedly told Defendants to stop selling the securities, Defendants sold another $2.3 million in interests in the R9 Program, or 84% of the total money raised in that program.  Defendants finally stopped selling the R9 Program on or about January 28, 2012.

# V.
# CLAIMS FOR RELIEF

## FIRST CLAIM
### Violations of Exchange Act 15(a)

25. The Commission repeats and re-alleges Paragraphs 1 through 24 of the Complaint as if fully set forth herein.

26. Defendants, directly or indirectly, singly or in concert with others, while engaged in the business of effecting transactions in securities for the account of others, made use of the mails or any means or instrumentalities of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security without being registered in accordance with Section 15(b) of the Exchange Act.

27. By engaging in this conduct, Defendants violated, and unless restrained and enjoined will in the future violate Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

## SECOND CLAIM
### Violations of Section 5(a) and 5(c) of the Securities Act

28. The Commission repeats and re-alleges Paragraphs 1-24 of the Complaint as if fully set forth herein.

29. By their conduct as alleged above, Defendants, directly or indirectly, singly or in concert with others, (i) made use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of any prospectus or otherwise, securities as to which no registration statement was in effect; (ii) for the purpose of sale or delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any securities as to which no registration statement was in effect; or (iii) made use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to

buy, through the use or medium of a prospectus or otherwise, any securities as to which no registration statement had been filed.

30. No valid registration statement was filed or was in effect with the Commission in connection with Defendants' offer or sale of securities. There were no applicable exemptions from registration.

31. By engaging in this conduct, Defendants violated and, unless enjoined, will continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and §77e(c)].

## VI.
## RELIEF REQUESTED

For these reasons, the Commission respectfully requests that the Court enter a judgment:

(a) Permanently enjoining Defendants, their agents, servants, employees, attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating, directly or indirectly Section 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 5 U.S.C. §§ 77e(a) and §77e(c)] and Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)];

(b) Ordering Defendants to disgorge all ill-gotten gains and/or unjust enrichment realized by each of them, plus prejudgment interest thereon;

(c) Ordering each Defendant to pay an appropriate civil monetary penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

(d) Retaining jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

  (e)  Granting all other relief to which the Commission may be entitled.

Dated: January 13, 2017.

               Respectfully submitted,

               */s/ Janie L. Frank*
               Janie L. Frank
               Texas Bar No. 07363050
               SECURITIES AND EXCHANGE COMMISSION
               Fort Worth Regional Office
               Burnett Plaza, Suite 1900
               801 Cherry Street, Unit #18
               Fort Worth, TX 76102-6882
               (817) 978-6478
               (817) 978-4927 (facsimile)
               *frankj@sec.gov*

               COUNSEL FOR PLAINTIFF UNITED STATES SECURITIES AND EXCHANGE COMMISSION